**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X

**ROBERT RODRIGUEZ,**                               :

            **Plaintiff,**       :

                       :

       **- against -**       :

                       :

**SPECIAL AGENT ROBERT JOHN**       :
**WOLBACH and SPECIAL AGENT**       :
**JAMES L. BALCOM,  in their**       :
**individual and official capacities as Drug** :
**Enforcement Agents of the**       :
**United States of America,**       :

                       :

          **Defendants.**       :
------------------------------------------------------ X

**OPINION AND ORDER**

**05 Civ. 219 (SAS)**

6/27/08

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Robert Rodriguez brings this action against Drug Enforcement

Agency ("DEA") Special Agent Robert John Wolbach in his individual capacity.[1]

He alleges a violation of his Fourth Amendment rights and is seeking money

---

[1]       *See* Complaint ¶ 1.  The suit against Special Agent James L. Balcom
was dismissed for failure to effectuate service pursuant to Federal Rule of Civil
Procedure 4(m).  The suit against Special Agent John Wolbach in his official
capacity was dismissed pursuant to a Stipulation and Order. *See* 5/22/07 Joint
Letter to the Court.

damages.[2] In his Complaint, Rodriguez alleged that a DEA Special Agent caused

the U.S. Marshals Service to file a detainer against him while he was incarcerated

at Rikers Island based on an arrest warrant issued by the Southern District of West

Virginia on June 3, 1999.[3] The warrant charged Rodriguez with possession of six

hundred pounds of marijuana with intent to distribute.[4] Wolbach eventually took

custody of Rodriguez at Rikers Island based on that warrant.[5] Rodriguez alleged

that this arrest was made without probable cause, albeit based on a warrant,

because Wolbach should have known that Rodriguez had been incarcerated in

New York State when many of the events described in the warrant allegedly

occurred.[6]

Wolbach now moves to dismiss pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure and, in the alternative, for

---

[2]     *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 338 (1971); Complaint ¶ 2.

[3]     *See* 6/3/99 Warrant for Arrest, Criminal Complaint, and Affidavit of James L. Balcom ("Warrant"), Ex. B to 6/29/06 Declaration of Allison B. Penn, Defendant's Counsel, ("Penn Decl.").

[4]     *See* Complaint ¶¶ 8-9.

[5]     *See id.* ¶ 14.

[6]     *See id.* ¶ 13.

summary judgment on the ground of qualified immunity.[7]  In response to

defendant's motion, Rodriguez has abandoned his previous allegations and now

asserts that Wolbach took him into custody pursuant to a facially invalid warrant.[8]

Rodriguez seeks leave to amend his Complaint to conform to this new theory.[9]

For the reasons stated below, Wolbach's motion for summary judgment is granted.

## II.    BACKGROUND[10]

### A.    The Investigation

Special Agent James L. Balcom, a DEA agent based in Charleston,

West Virginia, was assigned to investigate a drug dealer based in New York who

sold drugs in West Virginia.[11]  The subject of the investigation was "Mark" or

---

[7]    *See* Memorandum of Law in Support of the Motion by Defendant Special Agent Robert J. Wolbach to Dismiss or in the Alternative for Summary Judgment ("Def. Mem.") at 1. I note that Wolbach never explains why he moved to dismiss for lack of subject matter jurisdiction.

[8]    *See* Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Mem.") at 1.

[9]    *See id.* at 11.

[10]    The facts summarized in this section are undisputed unless otherwise noted. For convenience, this section will cite facts from the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") whenever possible. Rodriguez "does not dispute the fact[s] raised in Defendant's Statement of Material Fact." Plaintiff's Statement of Material Facts in Issue Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 1.

[11]    *See* Warrant ¶¶ 1-2.

3

"Merv," described in 1995 by two cooperating witnesses who alleged that he trafficked in cocaine hydrochloride and cocaine base in the Southern District of West Virginia.[12]

During January 1999, an anonymous informant told a detective in the Charleston, West Virginia Police Department Drug Unit that "Merve Minoya,"[13] a Dominican male, was trafficking cocaine from New York and selling it in Bluefield, West Virginia and Charleston, West Virginia.[14] This informant told the detective that Minoya used the alias "Damon Anthony Stone."[15] The informant also told the police that Minoya maintained two addresses in the Charleston area — rental properties in Charleston, West Virginia and Belle, West Virginia.[16] Lastly, the informant told the police that Minoya used a blue Buick Park Avenue with a hidden compartment.[17] By checking with the property's landlord, the

---

[12]    *See id.* ¶¶ 2-8.

[13]    West Virginia police spelled this name phonetically. *See id.* ¶ 9.

[14]    *See* Def. 56.1 ¶ 2.

[15]    *See id.*

[16]    *See id.*; Warrant ¶¶ 10-11.

[17]    *See* Def. 56.1 ¶ 2.

4

detective determined that a person using the name Damon Stone had rented the Charleston property since May 1, 1996.[18]

On May 2, 1999, Virginia State troopers stopped and searched a blue Buick Park Avenue registered to "Kevin James Turpin."[19] They seized $240,000 from the car and found a secret compartment.[20]

On May 11, 1999, Balcom secured search warrants for both of Minoya's residences.[21] He and other DEA officers searched the Charleston residence and recovered seven hundred pounds of marijuana, fifteen grams of cocaine, six handguns, digital scales, miscellaneous papers, and a vehicle registered to Kevin Turpin.[22] The police also determined that an "Anthony Stone" had subscribed, since May 1, 1996, to a utility at the Belle residence.[23] DEA Agents and West Virginia Police raided the Belle residence and seized four

---

[18]     *See id.* ¶ 2; Warrant ¶ 17.

[19]     *See* Def. 56.1 ¶ 3.

[20]     *See id.*

[21]     *See id.*

[22]     *See id.*

[23]     *See* Warrant ¶ 17.

kilograms of cocaine, two guns, $36,600 in currency, and receipts payable to "Damon Stone."[24]

During May 1999, Balcom received two arrest reports concerning Damon Anthony Stone from the Bluefield, West Virginia Police Department.[25] The first arrest on June 9, 1993 was for Joyriding.[26]  This report contained a photograph of Rodriguez.[27]  The second arrest on June 25, 1993 was for Breaking and Entering.[28] During the second arrest, Stone's girlfriend told the police that Stone's real name was Robert Quincy Rodriguez.[29]  The arrest report also noted that Rodriguez's birth date was June 24, 1970.[30]  Rodriguez admitted that the two reports described him as the arrestee and that he told the Bluefield police that his name was Damon Stone.[31]

---

[24]    See Def. 56.1 ¶ 3.

[25]    See id. ¶ 4.

[26]    See id.

[27]    See id.

[28]    See id.

[29]    See id.

[30]    See Warrant ¶ 21.

[31]    See 5/9/06 Deposition of Robert Rodriguez, Ex. F to Penn Decl., at 92-94.

In reviewing the National Crime Information Center database,

Balcom learned that Rodriguez had been arrested for robbery in New York in

1995.[32] Balcom obtained the photographs from that arrest.[33]  On June 1, 1999,

Balcom met with each of the two witnesses who spoke to the West Virginia Police

at the start of the investigation.[34]  The first witness identified the individual in

Rodriguez's 1993 and 1995 arrest photographs as the "Mark" or "Merv" who was

the suspected West Virginia drug dealer.[35]  The second witness identified the

individual in those photographs as the "Mark" who had sold him drugs.[36]  The

second witness also stated that "Mark" had a girlfriend in Bluefield, West Virginia

and that he owned cars with hidden compartments.[37]

## B.    The Warrant

On June 3, 1999, Balcom filed a criminal complaint and an affidavit

in the Southern District of West Virginia detailing his investigation of the

---

[32]      *See* Def. 56.1 ¶ 6

[33]      *See id.*

[34]      *See id.* ¶ 7.

[35]      *See id.*; 12/19/01 Transcript of Criminal Cause for Identity Hearing ("Identity Hearing Tr."), Ex. G to Penn Decl., at 24.

[36]      *See id.*

[37]      *See* Warrant ¶ 22.

7

intended arrestee.[38]  Based on these documents, the court issued an arrest warrant

for "Damon Stone a/k/a 'Merv Minaya,' Mark and Robert Quincy Rodriguez."[39]

In his affidavit, Balcom stated that he was "participating in a[n] . . . investigation

involving Merve M[inoya] (phonetic)," that he  believed that "M[erv], M[ark],

Damon Anthony Stone, Damon S[tone], Anthony S[tone], Merve M[inoya]

(M[inaya]) and Robert Quincy R[odriguez] [were] all the same person," and that

there was probable cause to believe that the individual was "working in concert"

with Kevin Turpin and other unknown individuals to distribute cocaine and

marijuana.[40]  The affidavit also noted the addresses of the intended arrestee's

residences in West Virginia and Robert Quincy Rodriguez's date of birth.[41]

### C.    The Arrest

On December 1, 2001, New York City police officers arrested

Rodriguez for possession of a weapon and marijuana.[42]  Balcom  received

notification of Rodriguez's arrest through a computer system that tracks

---

[38]    *See id.* at attached criminal complaint.

[39]    *See id.* at front page of the warrant.

[40]    *Id.* ¶ 23.

[41]    *See id.* ¶¶ 10-11, 19-21.

[42]    *See* Def. 56.1 ¶ 9; 12/14/01 Rule 40 Affidavit of Robert John
Wolbach ("Wolbach Aff."), Ex. H to Penn Decl. ¶ 3.

outstanding warrants, and contacted Wolbach.[43] Balcom told Wolbach that

"someone [Balcom] had an arrest warrant for, Robert Quincy Rodriguez, had been

locked up by the New York Police Department."[44] Wolbach obtained a copy of

the 1999 arrest warrant and a copy of the photograph from Rodriguez's 1995 New

York arrest report, and faxed the photograph to Balcom.[45] Balcom advised

Wolbach that "that this was the guy [Balcom] was looking for, Robert Quincy

Rodriguez."[46]

On  December 10, 2001, Rodriguez pled guilty to disorderly conduct

and was sentenced to time served.[47] Before his release, however, the United States

Marshals Service filed a detainer on Rodriguez and the authorities continued to

hold him at Rikers Island.[48]

Three days later, on December 13, 2001, Wolbach received a digital

photograph of Rodriguez from the staff at Rikers Island and emailed the

---

[43]     *See* Def. 56.1 ¶ 10.

[44]     Identity Hearing Tr. at 40-41.

[45]     *See* Def. 56.1 ¶ 10.

[46]     *See* Identity Hearing Tr. at 41-42.

[47]     *See* Wolbach Aff. ¶ 4.

[48]     *See id.*

9

photograph to Balcom.[49]  Balcom showed the picture to one of the cooperating

witnesses, who identified Rodriguez as the individual described in the arrest

warrant.[50]  Balcom  advised Special Agent Wolbach of the identification, and

Wolbach took custody of Rodriguez on December 14, 2001.[51]  He fingerprinted

Rodriguez and sent these fingerprints to the Federal Bureau of Investigation

("FBI").[52]  The FBI confirmed that Rodriguez's fingerprints were identical to those

of an individual named in an outstanding warrant.[53]

On December 19, 2001, at an identity hearing held in the Southern

District of New York, Magistrate Judge Debra Freeman found that there was

probable cause to believe that Rodriguez was the individual named in the

warrant.[54]  A Grand Jury in the United States District Court for the Southern

District of West Virginia indicted Rodriguez for drug trafficking violations on

---

[49]     *See* Def. 56.1 ¶ 10.

[50]     *See id.*

[51]     *See id.* ¶ 11.

[52]     *See id.*

[53]     *See id.*

[54]     *See id.* ¶ 13.

December 19, 2001.[55]  Federal authorities held Rodriguez in custody in

correctional facilities in Oklahoma and then in West Virginia.[56]

## D.    The Release

On January 11, 2002, approximately five weeks after the New York

police took Rodriguez into custody, a Police Sergeant in Walterboro, South

Carolina stopped a car for a traffic violation.[57]  The driver first identified himself

as Robert Quincy Rodriguez, but he also possessed identification in a different

name.[58] After the police arrested the driver for possession of marijuana, the driver

informed the Sergeant that he knew the real Robert Quincy Rodriguez.[59] A

fingerprint check revealed that the driver's real name was Mervin Meniar.[60]  On

---

[55]     *See id.*

[56]     *See id.*

[57]     *See id.* ¶ 14;  1/15/02 Warrant for Arrest, Criminal Complaint and
Affidavit of Special Agent James L. Balcom ("2002 Warrant"), Ex. K to Penn
Decl. ¶ 23.

[58]     *See* 2002 Warrant ¶ 23.

[59]     *See id.*; Def. 56.1 ¶ 14.

[60]     *See* Def. 56.1 ¶ 14.

11

January 15, 2002, Balcom obtained an arrest warrant for Meniar based on the facts detailed in the affidavit attached to the 1999 warrant.[61]

Rodriguez was released from federal prison in West Virginia on January 15, 2002.[62] The United States dropped the charges against him that same day.[63] The United States also admitted, in its motion to dismiss the 1999 arrest warrant, that "Robert Quincy Rodriguez is not the true individual referenced in the warrant and related complaint and indictment."[64] Rodriguez seeks ten million dollars in damages for the approximately five weeks during which he was wrongfully incarcerated.[65]

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and

---

[61]   *See* 2002 Warrant.

[62]   *See* Def. 56.1 ¶ 15.

[63]   *See id.*

[64]   1/15/02 Motion to Dismiss Arrest Warrant, Ex. L to Penn Decl., ¶ 2.

[65]   *See* Complaint ¶¶ 14-18.

plain statement of the claim showing that the pleader is entitled to relief.' Specific

facts are not necessary . . . ."[66] When a complaint is attacked by a Rule 12(b)(6)

motion to dismiss, the plaintiff need not provide "detailed factual allegations."[67]

To survive a motion to dismiss, it is enough that the complaint "give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests."[68]

   The task of the court is "merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in

support thereof."[69] When deciding a defendant's motion to dismiss under Rule

12(b)(6), a judge must "accept as true all of the factual allegations contained in the

complaint"[70] and "draw all reasonable inferences in plaintiff's favor."[71]

   While there are legitimate reasons to dismiss a case under Rule

12(b)(6), "[t]he case cannot, however, be dismissed on the ground that petitioner's

---

  [66] *Erickson v. Pardus*, 551 U.S. __, slip op. at 5 (2007).

  [67] *Bell Atlantic Corp. v. Twombly,* 550 U.S. __, 127 S. Ct. 1955, 1964 (2007).

  [68] *Id.*

  [69] *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

  [70] *Bell Atlantic,* 550 U.S. __, 127 S. Ct. at 1975 (citation omitted).

  [71] *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

allegations of harm were too conclusory to put these matters in issue."[72] Thus, although the court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law if it appears . . . that the plaintiff can prove no set of facts in support of its claim which would entitle [him] to relief, or if the claim is not legally feasible."[73]

## B.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[74] An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[74] A fact is material when it "'might affect the outcome of the

---

[72]     *Erickson,* slip op. at 7 (2007).

[73]     *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006)).

[74]     Fed. R. Civ. P. 56(c).

[74]     *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

14

suit under the governing law.'"[75]  "It is the movant's burden to show that no genuine factual dispute exists."[76]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[77]  To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[78] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[79]  However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[80]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving

[75]     *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[76]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[77]     *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005).

[78]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[79]     *Jeffreys*, 426 F.3d 5 at 554  (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[80]     *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

15

party and draw all justifiable inferences in that party's favor.[81]  However, "[i]t is a

settled rule that '[c]redibility assessments, choices between conflicting versions of

the events, and the weighing of evidence are matters for the jury, not for the court

on a motion for summary judgment.'"[82]  Summary judgment is therefore

inappropriate "if there is any evidence in the record that could reasonably support

a jury's verdict for the non-moving party."[83]

## IV.  APPLICABLE LAW

### A.  *Bivens* Claims

To maintain a *Bivens* action, a plaintiff must establish that a federal

actor violated his rights under the Constitution or laws of the United States.[84]  To

prevail, a plaintiff must show that his arrest violated his Fourth Amendment

rights.[85]

---

[81]      *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473
F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131
F.3d 305, 312 (2d Cir. 1997)).

[82]      *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d
50, 55 (2d Cir. 1997)). *Accord Anderson,* 477 U.S. at 249.

[83]      *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.
2002) (citing *Pinto v. Allstate Inc. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[84]      *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Bivens*, 403 U.S. at
389-90.

[85]      *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (holding that plaintiff
can sue federal agents who violated Fourth Amendment rights by searching

## B.    Qualified Immunity

The doctrine of qualified immunity shields government officials from

civil liability as long as "'their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have

known.'"[86]   Qualified immunity balances "the need . . . to hold responsible public

officials exercising their power in a wholly unjustified manner and . . . [the need]

to shield officials responsibly attempting to perform their public duties in good

faith from having to explain their actions to the satisfaction of a jury."[87]   Because

qualified immunity "is 'an immunity from suit rather than a mere defense from

liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"[88]

Accordingly, the Supreme Court has repeatedly "'stressed the importance of

_____

plaintiff's property pursuant to facially invalid search warrant); *Wong-Sun v. United States*, 371 U.S. 471, 481 (1963) (holding that Fourth Amendment particularity requirement applies to both arrest and search warrants).

[86]    *Velez v. Levy*, 401 F.3d 75, 100 (2d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[87]    *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001).

[88]    *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

17

resolving the question of qualified immunity at the earliest possible stage in litigation.'"[89]

When assessing a claim of qualified immunity, a court must first determine whether, "taken in the light most favorable to the party asserting injury . . . the officer's conduct violated a constitutional right."[90]  If no constitutional right is violated, no further inquiry is necessary.  However, if a constitutional violation is proven, "the next . . . step is to ask whether the right was clearly established."[91]  Qualified immunity applies unless the official's conduct violated a clearly established constitutional right.

### 1.    False Arrest and Probable Cause

The false arrest and false imprisonment of an individual are unconstitutional under the Fourth Amendment.[92]  However, the existence of probable cause to arrest an individual is an absolute defense to these claims.[93]

---

[89]    *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

[90]    *Id.*

[91]    *Id.*

[92]    *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995).

[93]    *See Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (citing *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)).

18

Probable cause exists when government officials have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."[94]  This knowledge must only provide "sufficient probability, not certainty."[95]  The existence of probable cause is determined by the totality of the circumstances.[96]

Even if probable cause does not exist in a given case, a law enforcement officer is entitled to qualified immunity where an officer has "'reasonable, if mistaken beliefs as to the facts establishing the existence of probable cause.'"[97]  In addition, if officers of reasonable competence could disagree on whether the probable cause test was met, then the officer is entitled to qualified immunity.[98]

Moreover, even if the officer who actually arrests a suspect lacks information to form the specific basis for probable cause, the arrest is lawful if

---

[94]   *Caldarola,* 298 F.3d at 162.

[95]   *Hill v. California*, 401 U.S. 797, 804 (1971).

[96]   *See Caldarola*, 298 F.3d at 162.

[97]   *Id.* (quoting *Saucier,* 533 U.S. at 205).

[98]   *See Escalera v. Lunn,* 361 F.3d 737, 643 (2d Cir. 2004).

19

other law enforcement officers involved in the investigation have sufficient
information to justify the arrest.[99] "The rule exists because, in light of the
complexity of modern police work, the arresting officer cannot always be aware of
every aspect of an investigation; sometimes his authority to arrest a suspect is
based on facts known only to his superiors or associates."[100] "Absent any evidence
tending to show that it was objectively unreasonable for [the arresting officer] to
disbelieve his [fellow] officer or question his good faith, [the arresting officer] [is]
entitled to rely upon [his fellow officer] in deciding whether there was probable
cause to [make the] arrest."[101]

### 2. The Particularity Requirement of the Fourth Amendment

For an arrest pursuant to a warrant to be lawful under the Fourth
Amendment, the arrest warrant must "particularly" describe "the person to be
seized."[102] To satisfy this requirement, an arrest warrant must "contain the
[intended arrestee]'s name or, if it is unknown, contain a name or description by

---

[99]     *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing
*United States v. Hensely*, 469 U.S. 221, 230-33 (1985)).

[100]    *Id.* (quoting *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986)).

[101]    *Beal v. City of N.Y.*, No. 92 Civ. 718, 1994 WL 163954, at *4
(S.D.N.Y. Apr. 22, 1994).

[102]    U.S. CONST. Amend. IV.

20

which the [intended arrestee] can be identified with reasonable certainty."[103] This
description should be on the face of the warrant.[104]

"Where the authorities do not know, or are uncertain of the intended
arrestee's name, then the name[s] placed on the warrant . . . [are] . . . arbitrary"[105]
and a valid arrest warrant must give some other description sufficient to identify
the intended arrestee.[106] Although an arrest warrant is "[not] necessarily invalid
whenever it incorrectly names the intended arrestee and contains no other
description of him," additional description is needed where "the authorities had
reason to suspect that the name placed on the warrant was not the real name of the
intended arrestee."[107] This requirement does not apply to a case in which "the

---

[103]    See Fed. R. Crim. P. 4(b)(1)(A); West v. Cabell, 153 U.S. 78, 85
(1894); United States v. Jarvis, 560 F.2d 494, 497 (2d. Cir 1977) (holding that
"John Doe" warrant that did not contain name or description was invalid).

[104]    See United States v. George, 975 F.2d 72, 76 (2d Cir. 1992).

[105]    Powe v. City of Chicago, 664 F.2d 639, 647 (7th Cir. 1981) (holding
that an arrest warrant was invalid where intended arrestee had stolen plaintiff's
wallet and used plaintiff's driver's license as identification when intended arrestee
was convicted of a crime, where police issued warrant naming plaintiff after
intended arrestee violated probation, and where police repeatedly arrested plaintiff
pursuant to this warrant despite learning that the name on the warrant was not the
intended arrestee's name).

[106]    See id.

[107]    Id.

21

authorities responsible for preparing the warrant have good reason to believe that the name on the warrant is the real name of the intended arrestee, and have no reason to suspect otherwise."[108]

The warrant does not have to describe the intended arrestee's physical appearance or address.[109] Rather, to avoid a "substantial risk . . . that a person to whom not the least suspicion has attached will be arrested,"[110] the description must be "accurate"[111] and eliminate most people as potential subjects of the warrant.[112] If the authorities have reason to suspect that the name on the warrant was not the real name of the intended arrestee, an alias used by the intended arrestee will not be a sufficient  description.[113]

---

[108]    *Id.*

[109]    *See id.*

[110]    *Id.* at 648.

[111]    *Id.* at 647.

[112]    *See Brown v. Patterson*, 823 F.2d 167, 168 (7th Cir. 1987) (warrant that listed the name, address, birth date, gender and ethnicity of an intended arrestee was facially valid); *United States v. Doe*, 703 F.2d 745, 748 (3d Cir. 1983) (holding warrant that named the intended arrestee as "John Doe a/k/a Ed" but included no other description did not reduce the number of potential subjects to a tolerable level because of the high number of people named "Ed" in the Pittsburgh area and was therefore invalid).

[113]    *See Powe*, 664 F.2d at 647 (holding that the warrant was facially invalid even though warrant correctly listed a known alias the intended arrestee used and police arrested an individual whose name was listed on the warrant).

### 3.    Clearly Established Law Standard

Once a plaintiff establishes that a defendant's conduct infringed a

constitutional right, he must then prove that at the time the infringement took

place, the law prohibiting defendant's conduct was clearly established.  Clearly

established means:  "'(1) the law is defined with reasonable clarity, (2) the

Supreme Court or Second Circuit has recognized the right, and (3) a reasonable

defendant would have understood from the existing law that his conduct was

unlawful.'"[114]  If an official's conduct did not violate clearly established law, that

official is entitled to qualified immunity.

"Even where the plaintiff's federal rights and the scope of the

official's permissible conduct are clearly established, the qualified immunity

defense protects a government actor if it was objectively reasonable for him to

believe that his actions were lawful at the time of the challenged act."[115]  "A[n]

[official]'s actions are objectively unreasonable, and therefore are not entitled to

_____

[114]    *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).

[115]    *Anthony v. City of N.Y.*, 339 F.3d 129, 137 (2d Cir. 2003) (citing *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).

23

immunity, when no officer of reasonable competence could have made the same choice in similar circumstances."[116]

## V.   DISCUSSION

### A.   False Arrest and Probable Cause

Rodriguez initially alleged that he was falsely arrested and imprisoned for drug trafficking offenses that he did not commit.[117]  The evidence shows that Balcom knew of "reasonably trustworthy information of facts and circumstances that [were] sufficient to warrant a person of reasonable caution in the belief"[118] that Rodriguez had possessed six hundred pounds of marijuana with the intent to distribute.  Accordingly, because Balcom had probable cause to arrest Rodriguez,  Wolbach cannot be held liable for false arrest or imprisonment.

Balcom based his determination that there was probable cause to arrest Rodriguez on a variety of sources.  First, a confidential informant gave West Virginia  police information about a drug dealer named "Merve Minoya" who brought cocaine from New York to West Virginia for distribution and who

---

[116]   *Id.* at 138.

[117]   *See* Complaint ¶ 16.  Rodriguez seems to have abandoned this claim. Nevertheless, because his Complaint has not been amended, it is appropriate to briefly address this claim.

[118]   *Caldarola,* 298 F.3d at 162.

24

used the name "Damon Anthony Stone." Other evidence corroborated this information — an automobile and currency that West Virginia police seized at a traffic stop; the lease for one residence and a utility subscription for the other residence; and drugs (including the six hundred pounds of marijuana identified on the face of the warrant), guns, currency, receipts and a car that Balcom and other DEA agents seized during searches of these two residences.

In the next step of his investigation, Balcom linked the name Damon Anthony Stone to Rodriguez. He did this based on two 1993 Bluefield, West Virginia arrest reports for "Damon Anthony Stone." In one of the reports, Rodriguez's girlfriend told Bluefield police that Rodriguez was using the name Damon Anthony Stone as an alias. Based on a photograph of Rodriguez in the second Bluefield arrest report and another photograph of Rodriguez from a 1995 New York arrest report, two witnesses then identified Rodriguez as the "Mark" or "Merv" who had sold cocaine that had been brought from New York to West Virginia. Before Wolbach took custody of Rodriguez, one of these witnesses once again identified Rodriguez as the drug dealer based on a photograph that Rikers Island staff took after Rodriguez's 2001 arrest in New York. Although Balcom was mistaken in concluding that Rodriguez was the "Damon Anthony Stone" who

25

committed the drug trafficking offense described in the warrant, his conclusion was reasonable in light of the identifications made by the two witnesses.[119]

Consequently, Balcom is not liable to Rodriguez for false arrest or imprisonment. Moreover, since Wolbach took Rodriguez into custody based on Balcom's instructions and the information that Balcom had gathered in his investigation, Wolbach is not liable for false arrest or imprisonment.

### B.    Validity of the Warrant

Rodriguez argues that Wolbach took him into custody pursuant to a facially invalid warrant because the authorities were uncertain of the name of the intended arrestee and the warrant lacked a description of that person.[120] Rodriguez further asserts that Wolbach violated his Fourth Amendment right not to be arrested except pursuant to a valid warrant or upon a finding of probable cause.[121]

---

[119]    The confusing nature of the facts in this case stems from Rodriguez and Meniar's use of the same names. Robert Quincy Rodriguez used the alias "Damon Anthony Stone." Mervin Meniar also used the alias "Damon Anthony Stone" and two derivatives of this alias — "Damon Stone" and "Anthony Stone." Meniar also used the aliases "Mark," "Merv" and "Robert Quincy Rodriguez." One theory that may explain this fact is that Rodriguez and Meniar met at some point, as Meniar admitted to knowing the "real" Robert Quincy Rodriguez, and Meniar then used Rodriguez's name and alias to conceal his own activities. It is also likely that the witnesses were mistaken about their identification of Rodriguez as the individual they knew as "Mark" or "Merv."    :

[120]    See Pl. Mem. at 6.

[121]    See id. at 3.

26

Wolbach, in turn, argues that Robert Quincy Rodriguez was the name of the

intended arrestee and that although Rodriguez was not the individual who

committed the crime alleged in the warrant, the warrant was facially valid because

it named its intended arrestee.[122]  While the warrant may have been facially

invalid, I need not decide the issue because Wolbach's belief that the warrant was

facially valid was reasonable.  Wolbach is accordingly entitled to qualified

immunity and amendment of the Complaint would be futile.[123]

## 1.    Facial Validity of the Warrant

It is unclear whether the warrant is facially valid.  Rodriguez relies on

the Seventh Circuit decision in *Powe v. City of Chicago* in arguing that the warrant

was facially invalid because it lacked additional descriptive information about the

intended arrestee.[124]  But the *Powe* case is both non-binding and distinguishable.

In *Powe*, the intended arrestee stole the plaintiff's driver's license and used it as

---

[122]    *See* Reply Memorandum in Further Support of the Motion by
Defendant Special Agent Robert J. Wolbach to Dismiss or in the Alternative for
Summary Judgment at 4-5.

[123]    It should be noted that it is procedurally improper for the
defendant to raise this claim after the parties have completed discovery and
without notice of motion. I will nonetheless address this new theory because it is
efficient to do so while considering the other arguments raised herein.

[124]    *See* Pl. Mem. at 6-7.

27

identification when he was arrested.[125] After the intended arrestee violated

probation, an arrest warrant was issued in the name of the plaintiff that listed

another alias that the intended arrestee used but contained no other descriptive

information.[126] Chicago police then repeatedly arrested the plaintiff pursuant to

this warrant.[127] There, police had good reason to believe that the name on the face

of the warrant was not the intended arrestee's true name because they arrested the

plaintiff and verified that the intended arrestee had stolen his driver's license and

used it as identification before arresting the plaintiff again pursuant to the same

warrant. In the instant case, by contrast, Balcom had no reason to believe that

Robert Quincy Rodriguez was not the defendant's true name. Indeed, much of the

evidence that Balcom collected pointed to the conclusion that Robert Quincy

Rodriguez committed the crimes charged in the warrant.

      In addition, the affidavit attached to the warrant contained additional

descriptive information that could be used to identify Rodriguez with reasonable

certainty. In particular, it noted Rodriguez's true date of birth and Rodriguez's

---

[125]    *See Powe*, 664 F.2d at 642-43.

[126]    *See id.*

[127]    *See id.*

28

Case 1:05-cv-00219-SAS   Document 32   Filed 06/27/07   Page 29 of 32

West Virginia and New York arrests.[128] This information would ordinarily be

sufficient to satisfy the Fourth Amendment's particularity requirement.[129] In

*United States v. George*, however, the Second Circuit held that a court can only

cure a defective *search warrant* with information in an affidavit if the affidavit is

attached to the warrant and incorporated into the warrant by reference.[130] In this

case the affidavit was not incorporated into the warrant by reference. It is unclear,

however, whether *George* applies to arrest warrants as well as search warrants.

### 2.   Qualified Immunity

Nevertheless, the court need not decide whether the warrant is

facially valid because Wolbach is clearly entitled to qualified immunity. It was

objectively reasonable for him to believe that the warrant was facially valid. As an

initial matter, there is no Supreme Court or Second Circuit case that requires an

arrest warrant to list additional descriptive information about the intended arrestee

if the authorities are uncertain of the intended arrestee's true name as long as the

warrant truly named the intended arrestee or listed a name by which the intended

---

[128]    *See* Warrant ¶¶ 21-22.

[129]    *See Brown*, 823 F.2d at 167.

[130]    *See George*, 975 F.2d at 76.

arrestee could reasonably be identified.[131]  It was therefore objectively reasonable for Wolbach to conclude that the warrant was facially valid because it accurately named the person that Balcom told him was the intended arrestee.[132]

Moreover, it was objectively reasonable for Wolbach to believe that Balcom was certain that the intended arrestee's name was Robert Quincy Rodriguez. All of Balcom's communications with Wolbach suggested that Balcom believed Rodriguez was the intended arrestee's true name. Balcom gave Wolbach reason to believe this when he first contacted Wolbach and told Wolbach that "someone [Balcom] had an arrest warrant for, Robert Quincy Rodriguez, had been locked up by the New York Police Department."[133]  After this initial call, Wolbach sent Balcom pictures of Rodriguez and Balcom told him "that this was the guy he was looking for, Robert Quincy Rodriguez."[134]  Wolbach also read the

---

[131]    *But see Powe*, 664 F.2d at 647 (holding that a description is required).

[132]    No evidence has been proffered to show that it was objectively unreasonable for Wolbach to rely on Balcom's statements or that Wolbach should have doubted Balcom's good faith. Accordingly, it was reasonable for Wolbach to rely on Balcom's statements. *Cf. Beal*, 1994 WL 163954, at *4 (holding that the officer who processed plaintiff's arrest was entitled to rely on superior officer's determination that there was probable cause to arrest the plaintiff even though he did not see the plaintiff commit any crime).

[133]    Identity Hearing Tr. at 41-42.

[134]    *Id.*

30

affidavit attached to the warrant that noted both the witness's identification of Rodriguez and Rodriguez's true date of birth, and thus provided him with a strong basis to conclude independently that the intended arrestee's true name was Robert Quincy Rodriguez.[135]

## VI.    CONCLUSION

For the reasons set forth above,  defendant's motion for summary judgment based on qualified immunity is granted.[136]  The Clerk of the Court is directed to close this motion [Docket No. 20] and this case.

SO-ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 27, 2007

---

[135]      *See* Wolbach Aff.

[136]      Because the action is dismissed based on qualified immunity, I need not address defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).

31

**- Appearances -**

*For Plaintiff:*

Andrew F. Plasse, Esq.
ANDREW F. PLASSE, P.C.
352 Seventh Avenue, Suite 402
New York, New York 10001
(212) 695-5811

*For Defendant:*

Allison D. Penn
Assistant United States Attorney
86 Chambers Street - 3rd Floor
New York, New York 10007
(212) 637-2702

32